**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

BONNIE TRIPOLONE,

                              Plaintiff,                5:18-cv-00272 (BKS/ML)

v.

UNITED AIR LINES, INC., a Delaware
Corporation d/b/a UNITED EXPRESS,
COMMUTAIR, INC. d/b/a UNITED
EXPRESS, a Vermont corporation,
AMERICAN AIRLINES, INC. d/b/a
American Eagle, a Delaware corporation,

                              Defendants.

---

**Appearances:**

*For Plaintiff:*
James R. Brauchle
Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464

*For Defendant United Airlines, Inc.:*
Oliver Beiersdorf
Reed Smith LLP
599 Lexington Avenue, 22nd Floor
New York, NY 10022

*For Defendant CommutAir, Inc.:*
Marguerite D. Peck
Downing & Peck, P.C.
17 Battery Place, Suite 324
New York, NY 10004

*For Defendant American Airlines, Inc.:*
David S. Rutherford
Rutherford & Christie, LLP
800 Third Avenue, 9th Floor
New York, NY 10022

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

Plaintiff Bonnie Tripolone brings this diversity action against Defendants United Airlines, Inc. ("United"), CommutAir Inc. ("CommutAir"), and American Airlines, Inc., ("American").[1] (Dkt. No. 1). Plaintiff alleges: (1) negligence per se (First Claim), (2) negligent misrepresentation (Second Claim), (3) breach of duty (Third Claim), (4) negligence (Fourth Claim), (5) intentional infliction of emotional distress (Fifth Claim), and (6) negligent infliction of emotional distress (Sixth Claim).[2] (*Id.*). Presently before the Court are Defendants' motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. Nos. 56, 61, 64). Plaintiff opposes the motions. (Dkt. No. 71). For the reasons that follow, Defendants' motions for summary judgment are granted.

**II.    FACTS[3]**

    **A.    Parties**

        **1.    Plaintiff**

Plaintiff Bonnie Tripolone is a 73-year-old resident of Mattydale, New York who suffers from macular degeneration and is legally blind. (Dkt. No. 57-3, at 7, 20). Plaintiff does not have direct vision—when looking directly at an object, she cannot see it. (*Id.* at 22). However, when using her peripheral vision, she can see, though "things are not as clear." (*Id.* at 22, 86). She is

---

[1] Plaintiff also brought claims against Republic Airline Inc., (Dkt. No. 1), but this party has been dismissed based on the stipulation of all remaining parties. (Dkt. No. 46).

[2] Plaintiff requests to withdraw her negligent misrepresentation and breach of duty of a common carrier claims (Second and Third Claims). (Dkt. No. 71, at 6). Defendants do not contest these withdrawals. (*See* Dkt. Nos. 74–76). Accordingly, these claims will be dismissed.

[3] The facts are drawn from the Defendants' statements of material facts, (Dkt. Nos. 59, 62, 64-2), Plaintiff's response and counterstatement of material facts, (Dkt. No. 71-1), and the attached affidavits, declarations, exhibits, and depositions. The facts are taken in the light most favorable to Plaintiff.

unable to read. (*Id.* at 22). She uses her peripheral vision to navigate her everyday life. (*Id.* at 86–87).

### 2. Airlines

American is a Delaware corporation with its principal place of business in Texas. (Dkt. No. 57-2, at 2). CommutAir is a Delaware corporation with its principal place of business in Ohio.[4] (Dkt. No. 76-1, ¶¶ 3, 6). United is a Delaware corporation with its principal place of business in Illinois. (Dkt. No. 28, ¶ 2). On January 7, 2016, the Department of Transportation issued a consent order directing "United to cease and desist from future violations" of "14 CFR Part 382" and "the Air Carrier Access Act (ACAA)," which require airlines to "provid[e] passengers with a disability with enplaning and deplaning assistance, including connecting assistance and assistance in moving within the terminal." (Dkt. No. 71-6, at 2).

### B. Plaintiff's Trip

#### 1. Booking and Travel to North Carolina

In February 2017, Plaintiff flew from Syracuse, New York to Fayetteville, North Carolina to visit her daughter. (Dkt. No. 57-3, at 8, 23). Plaintiff's daughter reserved the flights, and she arranged for Plaintiff to have wheelchair assistance due to her visual impairment. (*Id.* at 30). Plaintiff had taken a direct flight alone to visit her daughter on a previous occasion. (*Id.* at 94–95). However, this was the first time she had to navigate a connection while flying alone. (*Id.* at 95). Plaintiff did not have a problem on her flights down to North Carolina. (*Id.* at 24).

---

[4] In her complaint, Plaintiff alleged that CommutAir is "incorporated under the laws of Vermont" and has its principal place of business in in New York. (Dkt. No. 1, ¶ 5). If CommutAir's principal place of business were New York, the Court would not have diversity jurisdiction. *See* 28 U.S.C. § 1332(c)(1). However, the Court finds that there is diversity jurisdiction based on the evidence submitted by CommutAir. In its answer, CommutAir denied the allegations in the complaint regarding its place of incorporation and principal place of business. (Dkt. No. 26, ¶ 5). In its summary judgment reply, it submitted an affidavit from its Chief Financial Officer asserting that since at least January 2016 it has been incorporated in Delaware and had its principal place of business in Ohio. (Dkt. No. 76-1, ¶¶ 3, 6).

### 2. Departure from North Carolina

On March 3, 2017, Plaintiff was booked on a United flight from Fayetteville to Syracuse with a connection through Washington Dulles International Airport ("Dulles") in Virginia. (Dkt. No. 57-4, at 1–2). When Plaintiff arrived at the Fayetteville airport, she was given a wheelchair, and her daughter pushed the wheelchair to her departing gate. (Dkt. No. 57-3, at 49).

### 3. Events at Dulles

Plaintiff's flight from Fayetteville to Dulles was operated by CommutAir. (Dkt. No. 64-2, ¶ 9). The flight leaving Fayetteville was delayed because "it was overweight." (Dkt. No. 57-3, at 52). When the plane arrived at Dulles, Plaintiff had to wait for her wheelchair to arrive. (*Id.* at 61–62). She was then brought to a holding area in order to be transported to her next gate, but the driver was not there. (*Id.* at 66). Due to these delays, Plaintiff missed her connecting flight. (*Id.* at 68).

Plaintiff was wheeled to the United ticket counter, where she was told that she would have to take an American flight out of Ronald Reagan Washington National Airport ("Reagan"). (*Id.* at 68–69). Plaintiff was given "a bunch of brochures or vouchers" but she could not "read any of them." (*Id.* at 70). She was told she would "go in a van" to Reagan but was not told how to find the van. (*Id.* at 71). She "didn't have a lot of money with [her]," and "was worried about having to pay [her] way [to Reagan]." (*Id.* at 70). The wheelchair attendant wheeled Plaintiff to a bench inside the terminal, told Plaintiff she would "be more comfortable on the bench," and then left with the wheelchair. (*Id.* at 72–73).

Plaintiff waited on the bench for "at least an hour." (*Id.* at 74). She "started getting really upset" and a man waiting nearby asked "if there was anything he could do to help [her]." (*Id.* at 75). She told him that she did not "understand what any of [the paperwork] sa[id]" and she was "supposed to be in a wheelchair." (*Id.*). The man went to get an airline worker, and then went to

4

get her a wheelchair. (*Id.* at 75–76). A worker came to speak with Plaintiff, but she could not understand what they were saying because they spoke with an accent. (*Id.* at 76). Plaintiff was then left by herself in a wheelchair. (*Id.* at 77). After a period of time, a man—who turned out to be the van driver—approached her from behind and asked if she was waiting for a van. (*Id.* at 78–79). She said yes, and he wheeled her outside to the van. (*Id.* at 79–80). It was a gray van and Plaintiff could not tell whether it was an airport courtesy van. (*Id.* at 80). There was "another man inside, he was on a cell phone speaking in a foreign language." (*Id.* at 81). During the drive, Plaintiff attempted to ask the driver questions but he "wouldn't answer [her]." (*Id.* at 82). They drove "for a long time," "going off and on highways." (*Id.* at 81–82). When the other passenger got off the phone, Plaintiff asked him if he knew where they were, and he said "in Virginia." (*Id.* at 83). This alarmed Plaintiff because she believed Reagan was in Washington, D.C. (*Id.*). she "started to think [she was] going to end up on the side of the road." (*Id.*). The van dropped the other passenger off "in a house" or "apartment complex." (*Id.*). During the ride, Plaintiff was "terrified." (*Id.* at 84).

### 4. Events at Reagan

When they arrived at Reagan, the driver "asked [her] if [she] could walk," and she replied that she "can walk but [she] can't see." (*Id.* at 85). He then left her "standing there on the curb" with no wheelchair. (*Id.*). Plaintiff then walked over to the outside "baggage booth" and "asked them if they could her [her]." (*Id.* at 88–89). The worker there replied that if she did not have luggage to check, she could not help her. (*Id.* at 89).

Plaintiff then noticed wheelchairs nearby, and she went and sat in one in the hopes of getting help. (*Id.* at 90). A worker came over and looked at her ticket and told her he could not take her to her gate, because it was "too far" unless she would "give [him] a great big tip." (*Id.*).

5

She asked him to bring her inside, which he did, and then he "told [her] to get out of [his] wheelchair." (*Id.* at 91).

She sat on a bench, near a ticket counter. (*Id.*). She began to panic, and started yelling out, "can somebody help me, I need help here." (*Id.*). A worker approached her and got her a wheelchair. (*Id.*). She brought Plaintiff to an American desk. (*Id.* at 99). They told her that it would be a couple hours until her flight departed and that "they would come over and get [her] when they needed [her]." (*Id.* at 99). Plaintiff needed to go to the bathroom, and had not eaten, but did not "know what to do." (*Id.*).

After a period of time, she was placed on a bus in order to reach her flight. (*Id.* at 99–100). She was wheeled onto the runway, and a worker "asked if [she] could walk," and she replied that "[she] can walk, [she] just can't see." (*Id.* at 101). The worker then helped her off the bus, pointed to the airplane, and said "the plane's right there" and left. (*Id.*). She was about 70 feet from the plane. (*Id.* at 103–04). Since it was dusk, Plaintiff had trouble seeing where to go and took out her cane. (*Id.* at 104). After a couple of minutes, a person "saw [her] struggling" and came over to help her. (*Id.*). Once she boarded the plane, a flight attendant helped her to her seat. (*Id.* at 105).

### 5. Arrival in Syracuse

Due to high winds, the flight had to land in Scranton, Pennsylvania. (*Id.* at 106). The plane eventually landed in Syracuse. (*Id.* at 107). Plaintiff received wheelchair assistance and was brought to her husband. (*Id.*). He noticed she looked a little "distraught" and "disoriented." (Dkt. No. 71-5, at 7). Later that night, Plaintiff was "in tears" and "in bad shape." (*Id.*).

### C. Post-trip events

Plaintiff was not physically injured. (Dkt. No. 57-3 at 157). As of the date of her deposition, on May 8, 2019, she had not seen a psychiatrist or psychologist in relation to this

incident because she was "going to try to deal with it on [her] own." (Dkt., No. 61-4, at 43). She had an appointment to see one. (*Id.*; Dkt. No. 71-5, at 8–9). On August 19, 2019, Plaintiff submitted an affidavit from her husband stating that she is currently under the care of a psychologist, "who has diagnosed her with Post Traumatic Stress Disorder." (Dkt. No. 71-9, ¶ 3). Plaintiff is now "afraid to go places by [herself]." (Dkt. No. 57-3, at 111). She is also "terrified about going on any kind of transportation." (*Id.* at 108).

Plaintiff's daughter wrote to United's customer service, and in its reply, it acknowledged that it "didn't provide [Plaintiff] with wheelchair assistance as requested, which is in violation of federal disability regulations." (Dkt. No. 71-7, at 2). Plaintiff's daughter submitted a disability complaint to the Department of Transportation and received a reply in a letter dated June 13, 2017. (Dkt. No. 57-8, at 2). The Department of Transportation investigation concluded that United violated 14 CFR Part 382. (*Id.* at 4–6).

## III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys*, 426 F.3d at 553–54 (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

## IV. DISCUSSION

### A. Negligence-based claims

Plaintiff alleges three separate negligence claims: negligence per se (First Claim), negligence (Fourth Claim), and negligent infliction of emotion distress (Sixth Claim).[5] (Dkt. No. 1). Defendants contend that, pursuant to New York choice of law rules, Virginia law should apply to these claims because "it is the location of the alleged incident." (Dkt. No. 61-1, at 16; *see also* Dkt. No. 58, at 13–15; Dkt. No. 65, at 9–10). Because Plaintiff did not suffer any physical injuries—which Virginia law requires for negligence claims—Defendants argue these claims should be dismissed. (Dkt. No. 58, at 15; Dkt. No. 61-1, at 19–21; Dkt. No. 65, at 9–10). Plaintiff argues that New York and Virginia's differing tort laws reflect "conflicting loss-allocating rules," and so New York law should apply because New York has a greater interest in

---

[5] Plaintiff also alleged breach of duty of a common carrier (Third Claim) and negligent misrepresentation (second claim), (*id.*), but has sought to withdraw these claims. (Dkt. No. 71, at 6).

8

the litigation. (Dkt. No. 71, at 13 (quoting *Tkaczevski v. Ryder Truck Rental, Inc.*, 22 F. Supp. 2d 169, 173 (S.D.N.Y. 1998))).

A federal court "sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law." *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)). "In New York, the forum state in this case, the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." *Id.* (citing *Curley v. AMR Corp.*, 153 F.3d 5, 11 (2d Cir. 1998)); *see also In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993). If there is no conflict, as the forum state, New York law applies. *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 422 (2d Cir. 2006). However, "[w]here the applicable law from each jurisdiction provides different substantive rules, a conflict of laws analysis is required." *Curley*, 153 F.3d at 12.

"In tort actions, if there is a conflict of laws, New York courts apply an 'interest analysis.'" *Id.* (citing *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir. 1992)). Under this analysis, "[t]he law of the jurisdiction having the greatest interest in the litigation will be applied." *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir. 2006) (quoting *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197 (1985)). "[W]hen the domiciles of the parties differ, the location of the injury determines the governing substantive law absent special circumstances." *Gray v. Busch Entm't Corp.*, 886 F.2d 14, 15 (2d Cir. 1989) (citing *Bader by Bader v. Purdom*, 841 F.2d 38, 40 (2d Cir. 1988)).

To determine whether the location of the injury governs, courts in New York consider whether the laws at issue are conduct regulating or loss allocating. *Schultz*, 65 N.Y.2d at 197–98. When "conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort

occurred will generally apply because the jurisdiction has the greatest interest in regulating behavior within its borders." *Spinrad v. Comair, Inc.*, 825 F. Supp. 2d 397, 402 (E.D.N.Y. 2011) (quoting *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 522 (1994)). "Loss allocating rules, on the other hand, are those which prohibit, assign, or limit liability after the tort occurs," such as charitable immunity, guest, wrongful death and vicarious liability statutes. *Padula*, 84 N.Y.2d at 522. "Where the conflict is between loss-allocating rules, the locus jurisdiction has a lesser interest and the interest of the parties' domiciles assumes correspondingly greater importance." *Hamilton v. Accu-Tek*, 47 F. Supp. 2d 330, 337 (E.D.N.Y. 1999).

Here, the Court finds that an actual conflict exists between New York and Virginia laws with respect to Plaintiff's negligence claims. As Defendants argue, "the well-settled rule in Virginia is that there can be no recovery for mental anguish and suffering resulting from negligence unaccompanied by contemporaneous physical injuries to the person." *Soldinger v. United States*, 247 F. Supp. 559, 560 (E.D. Va. 1965) (collecting cases); *see also Delk v. Columbia/HCA Healthcare Corp.*, 259 Va. 125, 137 (2000) (holding that physical injury is a required element of a cause for negligent infliction of emotional distress).[6] Under New York law, on the other hand, a plaintiff can recover for negligence "even though no physical injury occurred." *Mortimer v. City of New York*, No. 15-cv-7186, 2018 WL 1605982, at *27, 2018 U.S. Dist. LEXIS 53492, at *79 (S.D.N.Y. Mar. 29, 2018) (quoting *Taggart v. Costabile*, 14 N.Y.S.3d 388, 397 (2d Dep't 2015)); *see also In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 528 F. Supp. 2d 303, 309 (S.D.N.Y. 2007) ("[T]he law of New York developed to allow recovery for purely mental suffering absent physical harm under negligence.").

---

[6] Plaintiff concedes that under Virginia law "a lack of physical injury precludes a cause of action for negligence when the damages suffered are mental injuries unaccompanied by a physical injury." (Dkt. No. 71, at 17).

Thus, the Court must engage in an interest analysis in order to determine whether New York or Virginia law should apply. The parties are domiciled in different states.[7] There is no dispute that the alleged negligent acts took place solely in Virginia.[8] (Dkt. No. 58, at 13; Dkt. No. 61-1, at 15; Dkt. No. 71, at 13). Accordingly, "the location of the injury,"—in this case, Virginia— "determines the governing substantive law absent special circumstances." *Gray*, 886 F.2d at 15 (citing *Bader*, 841 F.2d at 40); *see also El-Hanafi v. United States*, 40 F. Supp. 3d 358, 366 (S.D.N.Y. 2014) (finding Virginia law applied to a negligent infliction of emotional distress claim because it was "the law of the state in which the tort allegedly occurred").

Plaintiff argues that New York law should apply because the differences in New York and Virginia tort law are "loss allocating" rather than "conduct regulating." (Dkt. No. 71, at 13–14). Defendants, on the other hand, assert that the conflict of law at issue concerns "whether a tort has actually occurred at all, not how the loss will be allocated," and thus "Virginia law should be applied." (Dkt. No. 75, at 5–6; *see also* Dkt. No. 74, at 6–7).

Plaintiff's argument—that the conflict between Virginia and New York negligence laws is loss allocating rather than conduct regulating—is unavailing. Loss allocating rules "are those which prohibit, assign, or limit liability *after* the tort occurs." *Padula*, 84 N.Y.2d at 522 (emphasis added). Here, the difference in New York and Virginia negligence laws reflects different requirements to establish a prima facie case of negligence—in other words, the conflict at issue concerns whether a tort occurred in the first place. "The law of negligence is a conduct-regulating rule because it seeks to hold defendants to a standard of care." *Bak v. Metro-N. RR.*

---

[7] Plaintiff is domiciled in New York. (Dkt. No. 57-3, at 7). United, American, and CommutAir are all Delaware corporations, with their principal places of business in Illinois, Texas, and Ohio (respectively). (Dkt. No. 28, ¶ 2; Dkt. No. 57-2, at 2; Dkt. No. 76-1, ¶¶ 3, 6). While Plaintiff argues that CommutAir has its principal place of business in New York, and thus New York has a heightened interest in having its laws apply, (Dkt. No. 71, at 12), the record reflects that CommutAir is not domiciled in New York. (Dkt. No. 76-1, ¶¶ 3, 6).

[8] Both Dulles and Reagan are located in Virginia.

*Co.*, 100 F. Supp. 3d 331, 338 (S.D.N.Y. 2015), *rev'd on other grounds* 650 F. App'x 63 (2d Cir. 2016); *see also Mark Andrew of Palm Beaches, Ltd. v. GMAC Commercial Mortg. Corp.*, 265 F. Supp. 2d 366, 378 (S.D.N.Y. 2003), *aff'd*, 96 F. App'x 750 (2d Cir. 2004) (noting that negligence and negligent misrepresentation claims are based on "conduct regulating rules rather than loss allocating rules, and therefore New York courts have usually applied the law of the place of the tort"); *Duffy v. United States*, 49 F. Supp. 2d 658, 660 (S.D.N.Y. 1999) (noting that the case "is a conduct-regulating negligence action" and so "the law of the place of the tort ordinarily dictates the choice of law"). Thus, because the conflict of laws "implicat[es] the regulation of conduct, the law of the jurisdiction in which the tort occurred takes on greater significance, and will generally apply." *Smith v. Boyer*, No. 05-cv-0487, 2006 WL 2008700, at *6, 2006 U.S. Dist. LEXIS 48379, at *20 (N.D.N.Y. July 17, 2006).[9] The Court finds there are no convincing "special circumstances" in this case that would warrant displacing this general rule, and thus holds that Virginia law applies.[10]

Accordingly, given that it is undisputed that Plaintiff did not suffer any physical injuries in connection with the events at issue, (Dkt. No. 71, at 17; Dkt. No. 57-3, at 161), the Court grants Defendants summary judgment for the Complaint's negligence-based claims, including

---

[9] Plaintiff's reliance on *Neumeier v. Kuehner*, 31 N.Y.2d 121 (1972), is misplaced because *Neumeier* and its progeny concern "[w]here loss-allocating laws are at issue." *Smith*, 2006 WL 2008700, at *6, 2006 U.S. Dist. LEXIS 48379, at *20; *see also Heisler v. Toyota Motor Credit Corp.*, 884 F. Supp. 128, 131 (S.D.N.Y. 1995) ("New York courts apply [the Neumeier principles] to loss-allocation cases generally.").

[10] Plaintiff argues that New York law should apply because "United and CommutAir operate flights into a number of New York cities," and "the underlying conduct at issue is not unique to Virginia, it is a systemic issue within United Airlines." (Dkt. No. 71, at 14 (citing Dkt. No. 71-6)). Even assuming this is the case, Plaintiff fails to cite any authority that would allow a conclusion that New York's interest in having its laws applied outweighs Virginia's greater interest "in regulating behavior within its borders." *Spinrad*, 825 F. Supp. 2d at 402 (quoting *Padula*, 84 N.Y.2d at 620).

negligence per se (First Claim),[11] negligence (Fourth Claim), and negligent infliction of emotion distress (Sixth Claim).

B. **Intentional Infliction of Emotional Distress**

The parties agree that there is no actual conflict between New York and Virginia regarding intentional infliction of emotion distress, (Dkt. No. 61-1, at 25; Dkt. No. 71, at 17), and thus New York law governs.[12] *See supra* Section IV.A. Defendants argue that their conduct "cannot be seen as extreme, outrageous or beyond the bounds normally tolerated in society," and so Plaintiff has failed to make a prima facie case for intentional infliction of emotional distress. (Dkt. No. 58, at 22; *see also* Dkt. No. 61-1, at 25–27; Dkt. No. 65, at 10–11). Plaintiff argues that, given her status as a "vulnerable person due to visual disability," Defendants' conduct in "leav[ing] [her] to fend for [herself] . . . is outrageous and extreme conduct." (Dkt. No. 71, at 18).

In New York, "a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999). "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to

---

[11] Plaintiff contends that "both New York and Virginia recognize negligence per se," and so summary judgment should be denied. (Dkt. No. 71, at 16). However, "negligence per se only exists '*where there is a common-law cause of action*. The doctrine of negligence per se does *not* create a cause of action where one did not exist at common law.'" *A.H. by next friends C.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 630–31 (2019) (quoting *Parker v. Carilion Clinic*, 296 Va. 319, 345 (2018)). Plaintiff has offered no caselaw to support its argument that despite Virginia's common law requirement of physical injury for negligence, negligence per se claims can survive without physical injury. Plaintiff's negligence per se claim references a regulation promulgated under the Air Carrier Access Act, 14 C.F.R. § 382. (Dkt. No. 1, at 6-7). Plaintiff, however, concedes that there is no private right of action under this Act; she states that she cited the regulation "as establishing the standard of care owed." (Dkt. No. 71, at 15); *see, e.g., Lopez v. Jet Blue Airlines*, 662 F.3d 593, 597–98 (2d Cir. 2011).

[12] Where, as here, the "parties' briefs assume that New York law controls, . . . such implied consent . . . is sufficient to establish choice of law." *Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir. 2000) (internal quotation marks omitted)

13

constitute intentional infliction of emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996). Conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society," *Stuto*, 164 F.3d at 827, and "[w]hether the alleged conduct is sufficiently outrageous enough to satisfy [this element] is a matter of law for a court to decide." *Baez v. JetBlue Airways*, 745 F. Supp. 2d 214, 223 (E.D.N.Y. 2010).

### 1. American

American argues that "most, if not all, of the alleged conduct took place prior to the arrival of [Plaintiff] at the American Airlines gate," and so its conduct "cannot be considered 'utterly intolerable or atrocious.'" (Dkt. No. 58, at 22–23). The Court agrees. American was not involved with the events at Dulles or transporting Plaintiff to Reagan. The only facts Plaintiff has alleged specifically connected to American[13] is that (1) Plaintiff was left by herself in Reagan while waiting for her flight and (2) was left approximately 70 feet from the plane, without a wheelchair or assistance, which she had trouble seeing as it was dusk. (Dkt. No. 57-3, at 99, 101, 104). No reasonable juror could find that American's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Stuto*, 164 F.3d at 827. Accordingly, the Court grants American summary judgment on Plaintiff's intentional infliction of emotional distress claim.

---

[13] The record is unclear as to whose baggage booth Plaintiff approached when she first reached Reagan. The record suggests it was a United baggage booth, (Dkt. No. 57-8, at 1), but United was "unable to confirm that assistance was refused" because it allegedly "do[es] not have any female skycaps attending curbside." (Dkt. No. 71-7). Nonetheless, the Court notes even assuming that Plaintiff interacted with American employees at that point, their actions would still not rise to the "high threshold" necessary for intentional infliction of emotional distress claims. *Bender*, 78 F.3d at 790. Plaintiff was told by one worker that if she did not have luggage to check, she could not help her. (Dkt. No. 57-3, at 89). Then, another worker would not transport her to her gate because it was "too far" unless she would "given [him] a great big tip." (*Id.* at 90). He then brought her inside and told her to "get out of [his] wheelchair." (*Id.* at 91). This conduct is not sufficiently extreme or outrageous enough to establish a prima facie case of intentional infliction of emotional distress.

### 2. CommutAir

Similarly, CommutAir contends that Plaintiff cannot establish the requisite elements of an intentional infliction of emotional distress against it because she "has not set forth any facts showing any egregious, extreme, or outrageous conduct by any employees of CommutAir toward her." (Dkt. No. 65, at 10). While CommutAir operated the flight from Fayetteville to Dulles, United "contracts with Air Serv Corporation for Air Serv employees to provide assistance to disabled passengers at [Dulles] and [Reagan]." (Dkt. No. 62, at 2; *see also* Dkt. No. 61-5, at 9). There is no evidence in the record that shows that CommutAir had any involvement with Plaintiff after she disembarked from her first flight. The ACAA states that "[i]f the arriving flight and the departing connecting flight are operated by different carriers, the carrier that operated the arriving flight . . . is responsible for providing or ensuring" assistance to passengers with disabilities. 14 CFR 382.91(a). Plaintiff argues that "there is a genuine issue of material fact as to who the operating carrier for the flight from Fayetteville to Dulles" was, United or CommutAir, and thus it is unclear who was responsible for providing Plaintiff assistance. (Dkt. No. 71, at 21). Nonetheless, even assuming CommutAir failed to fulfill its statutory duties under ACAA, Plaintiff has failed to identify any conduct by CommutAir that constitutes the outrageous conduct required to establish a prima facie case of intentional infliction of emotional distress. Thus, even assuming CommutAir was responsible for providing Plaintiff assistance, Plaintiff has failed to raise a material issue of fact and the Court issues summary judgment in favor of CommutAir on this claim.

### 3. United

United contends that it is entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim because Plaintiff has failed to "provide any evidence demonstrating that United's actions were intentional, extreme, and outrageous or that such

15

conduct caused Plaintiff severe emotional distress." (Dkt. No. 61-1, at 26). United argues that "the periods of time where Plaintiff alleges she was waiting to receive wheelchair assistance in no way rises to the level of extreme and outrageous conduct that 'transcends the bounds of [decency] as to be regarded as atrocious and intolerance in civilized society.'" (Dkt. No. 61-1, at 26-27 (quoting *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143 (1985))). Plaintiff argues that United "disregarded [its] duty to protect the vulnerable" and left Plaintiff "alone and abandoned." (Dkt. No. 71, at 18).

Construing the evidence in the light most favorable to Plaintiff, United's conduct included: (1) giving Plaintiff "a bunch of brochures or vouchers" she could not read, (2) not informing her of the details of her transportation, (3) leaving Plaintiff unattended while she waited over an hour for the van to arrive, (4) not answering Plaintiff's questions during transport, (5) leaving her on the curb of Reagan unattended and without informing her where she was, (6) not providing wheelchair attendance when requested at the outside baggage booth, and (7) leaving Plaintiff unattended inside the Reagan terminal for several hours. (Dkt. No. 57-3, at 70–91).

United's alleged conduct toward Plaintiff falls short of its own policies,[14] and it did not provide Plaintiff "with wheelchair assistance as requested, which is in violation of federal disability regulations." (Dkt. No. 71-7, at 2). However, the "'rigor of the outrageousness standard [for intentional infliction of emotional distress] is well-established,'" and the threshold is "exceedingly difficult to meet." *Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 530 (S.D.N.Y. 2013) (quoting *Mesa v. City of N.Y.*, No. 09-cv-10464, 2013 WL 31002, at *28, 2013 U.S. Dist.

---

[14] United's contract for "Passenger Services" provides that "[a]gents cannot leave wheelchair users unattended for more than 30 minutes," and should remain "with the wheelchair user until the customer is appropriately reaccommodated." (Dkt. No. 71-8, at 12).

16

LEXIS 1097, at *85 (S.D.N.Y. Jan. 3, 2013)). "Courts are reluctant to allow recovery under the banner of intentional infliction of emotional distress absent a deliberate and malicious campaign of harassment or intimidation." *Trachtenberg v. Failedmessiah.com*, 43 F. Supp. 3d 198, 206 (E.D.N.Y. 2014) (quoting *Thai v. Cayre Grp., Ltd.*, 726 F. Supp. 2d 323, 331 (S.D.N.Y. 2010)). The conduct alleged by Plaintiff does not meet the requisite threshold for outrageousness. *See, e.g., Norman v. TransWorld Airlines, Inc.*, No. 98-cv-7419, 2000 WL 1480367, at *4, 2000 U.S. Dist. LEXIS 14618, at *13–14 (S.D.N.Y. Oct. 6, 2000) (flight attendant's alleged verbal abuse and physical intimidation to passenger on plane "may have been rude and exasperating" but was not "sufficiently atrocious as to permit recovery" for intentional infliction of emotional distress); *Kaye v. Trump*, 58 A.D.3d 579, 579 (2009) (finding the defendant's rude remarks, commencing two baseless lawsuits, and frightening plaintiff by attempting to instigate her arrest were not sufficiently outrageous); *Seltzer v. Bayer*, 272 A.D.2d 263, 265 (2000) (holding that the defendant's actions of dumping a pile of cement, tossing lighted cigarettes, and threatening to paint a swastika on his neighbor's house "do not rise to the level of outrageousness or the kind of 'deliberate and malicious campaign of harassment or intimidation' that can survive a motion for summary judgment under controlling Court of Appeals precedent"). However unfortunate, the neglect Plaintiff suffered during the process of changing planes at Dulles and Reagan is not actionable as an intentional infliction of emotional distress claim. Accordingly, the Court issues summary judgment in favor of United on this claim.[15]

---

[15] Plaintiff's argument that United's conduct is sufficiently outrageous because its "conduct in this case is not unique" is unavailing. (Dkt. No. 71, at 18). Plaintiff has not offered any case law to support the notion that conduct directed toward unrelated third parties is relevant to a plaintiff's prima facie case for intentional infliction of emotional distress. The relevant question at issue is whether United's conduct *toward plaintiff* is sufficiently outrageous such that it goes "beyond all possible bounds of decency." *Stuto*, 164 F.3d at 827.

## V.  CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' Motions for Summary Judgment (Dkt. Nos. 56, 61, 64) are **GRANTED** in their entirety; and it is further

**ORDERED** that the Complaint (Dkt. No. 1) is **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

Dated: February 19, 2020
Syracuse, New York

*Brenda K. Sannes*
Brenda K. Sannes
U.S. District Judge